OPINION
{¶ 1} Defendant-Appellant Billy Thacker appeals from his conviction for Felony Murder with a firearm specification. On appeal Thacker claims that his conviction is against the manifest weight of the evidence and that the trial court erred in denying his motion for a mistrial because the State did not fully comply with the rules of discovery when it failed to provide him with copies of all of the photographic evidence.
 {¶ 2} We conclude that the State substantially complied with the discovery order, so that a mistrial was not warranted and that Thacker's conviction is not against the manifest weight of the evidence. Accordingly, we must affirm his conviction.
 I {¶ 3} On March 16, 2003 the victim, Jaymi Sergent, was staying with a close friend Wanda Morgan and Morgan's fifteen-year-old daughter Whitney Apple in their Springfield home. At that time Sergent and Thacker had been married for four years, but had been estranged for about a year. Nevertheless, Sergent visited with Thacker on several occasions since she moved in with Morgan the previous December.
 {¶ 4} Apple testified that Thacker called Sergent at about 5:00 p.m., and Sergent drove to Dayton to pick him up. When Sergent and Thacker returned to Springfield, Thacker smelled of beer and was slurring his speech; he appeared to be intoxicated. Thacker and Sergent sat outside for a while, and Thacker shot a few birds with a .38 caliber pistol that he brought with him. When they came inside, Thacker started bothering one of the family dogs, who bit Thacker on the nose. Sergent got a rag to clean up the blood.
 {¶ 5} At some point after that, Sergent told Apple that she and Thacker were going to the bedroom to "get naked," which Apple understood to mean that the couple was going to have sex. When Sergent and Thacker went into the bedroom, Thacker put his gun on the night stand by some cigarettes.
 {¶ 6} Apple stayed in the adjoining living room and watched television. However, she soon heard Sergent and Thacker arguing, with Thacker doing most of the yelling. The argument had to have been very loud to have been heard through the wall and over the sound of two televisions turned up loudly in the home. Suddenly, Apple heard a loud bang, followed by silence. Thinking that the noise could have been the slamming of the screen door, Apple waited for a minute or two before she went to the bedroom and opened the door. There she found Sergent lying naked on the floor. The gun was on the floor near Sergent's body. Thacker was lying in the bed, with the covers pulled up to his neck. He began screaming, "I didn't do it, I didn't do it, She did it, She did it!" Thacker got out of bed and started dressing.
 {¶ 7} Apple ran to the kitchen to call her mother. Apple told Morgan that Thacker had just shot Sergent. At the time of the call, Morgan was pulling into the driveway. When she entered the house, she found Thacker yelling at Apple and telling her to mind her own business. Morgan told Thacker and Apple to shut up and went to the back room, where she saw Sergent's body. Thacker demanded that Morgan take him back to his home in Dayton so that he could "get the H*** out of here!", but she refused.
 {¶ 8} Morgan called 911. Based on what Thacker told her, Morgan told the dispatcher that Thacker and Sergent had been arguing and that Sergent jumped up and fired the gun. In the background, Thacker was yelling at Apple to "shut the f*** up" and go to her room. While waiting for the police to arrive, Thacker repeatedly told Morgan that Sergent had shot herself. Thacker made no attempt to help Sergent, nor did he call for assistance himself. Instead, he went to the kitchen and poured himself a drink.
 {¶ 9} Greene County Sheriff's Deputy Fletcher, who was the first officer on the scene, found Thacker outside drinking on the porch. When Officer Fletcher asked Thacker if there was any chance that his wife was still alive, Thacker "indifferently" replied, "She's gone, man." Thacker then followed Fletcher inside and told Fletcher that he and Sergent were having sex when Sergent jumped up, grabbed the gun off of the night stand, asked if it was loaded, and shot herself. Officer Fletcher immediately doubted the story because the gun had a properly cycled new round ready, which only would have been possible if someone had a firm grip on the weapon after it was fired.
 {¶ 10} Sargeant Barrett came into the bedroom and took photos of the body and the gun before Fletcher moved the gun for paramedics to work on Sergent. Barrett began talking with Thacker and immediately noticed that he was highly intoxicated. Thacker told Barrett that Sergent shot herself. Thacker told Barrett basically the same thing that he had told Fletcher, except he stated that he had handed the gun to Sergent. However, when Sargeant Barrett asked more questions to clarify the circumstances of the shooting, Thacker reverted to his original claim that Sergent had grabbed the gun and shot herself. During the course of the interview, because Thacker became increasingly belligerent, cussing at the officers, Sargeant Barrett ordered Deputy Spatz to place Thacker under arrest.
 {¶ 11} Deputy Spatz also noticed that Thacker was very intoxicated. Thacker repeated his initial story about the shooting to Spatz, but Thacker added that when he and Sergent arrived at the house, Sergent handed Thacker the gun, and he shot some birds with it.
 {¶ 12} Major Harden first interviewed Thacker the day after his arrest. Thacker stated that Sergent wanted to stop having sex. Then she got out of bed for a cigarette, asked if the gun was loaded, and shot herself. However, Thacker told Harden that he did not actually see Sergent shoot herself, because he was watching television. Thacker insisted that he had not needed to call 911, because Morgan had. He denied being intoxicated, and claimed to have had only two drinks. He acknowledged "moving the body without touching it." He denied arguing with Sergent that day. Nevertheless, in a subsequent interview, Thacker told Harden and Greene County Prosecutor Bill Schenck that he was upset at the time of the shooting, but he continued to deny that he and Sergent had argued.
 {¶ 13} The State offered evidence to contradict Thacker's claim that Sergent committed suicide. Apple testified that Sergent was happy that day. Morgan testified that during the three months that Sergent stayed with her, Sergent talked a lot about how she was planning to continue to fix up her own house in Kentucky. In fact, Sergent intended to return home the day after she was killed. Morgan and Apple were planning a trip to visit Sergent later in the spring.
 {¶ 14} Sergent spoke to her daughter, Emily, and to her sister, Victoria Irwin, just prior to her death. Both testified that Sergent was happy and appeared to be feeling good about herself, despite plans to proceed with plans for divorcing Thacker. Sergent had recently had plastic surgery on her eyes, and she was in the process of getting dentures. Irwin offered to pay for Sergent's expenses related to the divorce. Sergent was looking forward to spending time with Emily and to a visit from Irwin's granddaughter at the end of March.
 {¶ 15} The State offered testimony of two inmates to whom Thacker admitted killing his wife. Right after his arrest, Thacker was taken to the Greene County Jail, where he was put in a communal holding cell. When fellow prisoner Patrick Massey asked Thacker why he was there, Thacker responded, "I shot my wife. I shot my wife." Thacker explained that he and Sergent were having sex and then argued. Sergent got up to have a cigarette, asked if the gun was loaded, and then shot herself. Massey and prisoner Donald Downs, who overheard the conversation, immediately reported Thacker's confession to jail officers and made written statements. Massey also gave a second written statement to Major Harden, who had been supervising evidence collection at the scene. Neither Massey nor Downs could have heard any press coverage regarding the shooting at the time they gave their statements.
 {¶ 16} A couple of days later, Thacker told Massey a third version of what happened. Thacker said that he and Sergent were arguing, and that she shot herself in the mouth and then smoked a cigarette. When Massey asked how that was possible, Thacker claimed that really he was holding the gun to Sergent's face when it accidently fired. Massey promptly told Major Harden of Thacker's confession and wrote out a third statement. Neither Massey nor Downs received any benefits for the information that they provided to the State.
 {¶ 17} Toxicology showed that there was no alcohol in Sergent's system, and the only drugs were medications consistent with appropriate treatment levels. Dr. Casto of the Coroner's Office testified that Sergent was killed by a single gunshot that entered her head above her right eye and exited out the back of her head, in a downward path. Sergent died instantly because the bullet went through her brainstem. Soot deposits and stippling on Sergent's face showed that the gun was a few inches from her face when it was fired. The gun found at Sergent's feet was the weapon that fired the bullet that killed her. However, the gun was never tested for fingerprints.[1] Sufficient gunshot residue was found on Thacker's palm to indicate that he had fired the weapon. Sergent's palm held significantly more gunshot residue, in an amount three to five times the amount expected after firing the gun, which the State's experts opined was likely the result of holding her hand out in a defensive gesture. No residue was found on the back of Sergent's hand, as would have been expected if she had fired the gun. Nor was residue found on the back of Thacker's hands, but his could have been wiped off before his hands were tested.
 {¶ 18} Dr. Casto testified that the nature of the shooting did not suggest suicide. Usually, suicide victims who shoot themselves put the muzzle of the gun firmly to their heads, not three or four inches away, as was the case here. It is also very unusual for a person committing suicide to shoot herself near the eye. Dr. Baden testified that he had never seen a woman shoot herself in the eye, with a downward trajectory of the bullet, like the trajectory of the bullet that killed Sergent. As a result of their investigations and experience with large numbers of autopsies, neither Dr. Casto nor Dr. Baden believed that Sergent shot herself.
 {¶ 19} Evidence technicians found Sergent's blood on the sheets, which had been covered by the comforter. The stains were transfer stains, not blood spatter, implying that Thacker got the blood on him during the shooting and transferred it to the sheets when he got back into bed.
 {¶ 20} At trial, Thacker maintained that Sergent had shot herself, probably by accident. He presented evidence that Sergent was not necessarily in such a good frame of mind. For example, in the 1980's, 1995, 2000 and 2001, Sergent had suffered from depression, even being hospitalized. Sergent had been diagnosed as bipolar, and she was taking both Lithium and the anti-depressant, Xanax, at the time of her death. In the late 70's or early 80's Sergent had tried to kill herself. Her wrists and arms still bore scars consistent with psychiatric patients who try to hurt themselves. The autopsy showed that Sergent suffered from a form of Hashimoto's disease, which can cause personality changes.
 {¶ 21} The jury convicted Thacker of Felony Murder and of the firearm specification. The trial court sentenced Thacker to fifteen years to life for the Murder conviction and to a mandatory, three-year term for the firearm specification. From his conviction and sentence, Thacker appeals.
 II {¶ 22} Thacker's first assignment of error is as follows:
 {¶ 23} "The trial court erred and denied appellant a fair trial as guaranteed under the fifth and fourteenth amendments to the U.S. Constitution when it refused to grant Appellant's motion for a mistrial based on the state's failure to comply with the discovery order."
 {¶ 24} In his first assignment of error, Thacker contends that because the State failed to provide him with copies of three or four photographs, it failed to fully comply with the discovery order. Moreover, Thacker asserts that he was prejudiced by this failure, because if he had had those particular photographs, his strategy at trial would likely have been different. He concludes that the trial court should, therefore, have granted his motion for a mistrial. We disagree.
 {¶ 25} Criminal Rule 16(B)(1)(C) requires the State to provide copies of documents and tangible objects, including photographs, to the defense prior to trial. When there is a discovery violation, the trial court has discretion to fashion an appropriate remedy. Crim.R. 16(E)(3); State v.Scudder, 71 Ohio St.3d 263, 268, 1994-Ohio-298. An appellate court must review a trial court's actions regarding alleged discovery violations under an abuse-of-discretion standard. State v. Parson (1983),6 Ohio St.3d 442, 445, 453 N.E.2d 689, citations omitted. "An abuse of discretion * * * implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court." State v. Reynolds, Montgomery App. No. 19780, 2003-Ohio-7245, ¶ 27, citing State v. Adams (1980),62 Ohio St.2d 151, 404 N.E.2d 144.
 {¶ 26} Prior to the trial the State provided Thacker with copies of well over 100 evidentiary photographs on a CD-ROM disk. At trial, however, Thacker realized that the State had failed to provide copies of three or four additional photos. Specifically, Thacker did not receive photos taken before the loaded gun was moved away from Sergent's body and did not receive a couple of the photos taken of blood on Sergent's hand. The State asserted that its failure to provide copies of all of the photos was entirely inadvertent.
 {¶ 27} Thacker argues that one or two photos showed blood on Sergent's hand and that he expected the State to use them to show that her hand must have been in a defensive position near the point of impact of the bullet. The trial court noted that Thacker could not have been surprised about the evidence, because he had been told that blood was found on Sergent's finger, but that the blood had not been tested. Additionally, the photos were cumulative of other photos that were provided, just showing the blood from different angles and distances. Nevertheless, as a remedy for this discovery violation, the trial court refused to allow the State to offer testimony regarding the blood found on Sergent's hand. We conclude that this was an appropriate remedy.
 {¶ 28} As for the photos of the location of the gun, we fail to see how Sergent could have been prejudiced or even surprised by those photos. In discovery, Thacker was provided with a copy of the police report, in which Deputy Fletcher stated that he moved the loaded gun away from Sergent's body for the protection of the paramedics. Deputy Fletcher testified to the same effect at trial. Sargeant Barrett confirmed that he took photos of the gun before it was moved. Thus, there could have been no genuine surprise that the gun was found next to Sergent's body. To the extent that the police report may have been at all unclear, Thacker had a duty to investigate before trial. See, e.g., Reynolds, supra, at ¶ 29.
 {¶ 29} The existence of the photos could only have helped Thacker's claim that Sergent shot herself. It is clear that Thacker was prepared to make this claim at trial. In other words, the photos of the gun in proximity to Sergent's body did not suggest a defense of which Thacker had previously been unaware, and which he could have better developed for trial had he been aware of the defense earlier. In addition to the testimony of the officers that the gun was found near her body, Thacker elicited testimony from two of the State's witnesses and from his own expert that finding the gun near the victim was consistent with a self-inflicted shot. No witness ever offered testimony to the contrary. Any additional testimony merely would have been cumulative of that already offered by three other witnesses.
 {¶ 30} "[A] trial court must impose the least severe sanction for a discovery violation that is consistent with the purposes of the rules of discovery." State v. Macias, Darke App. No. 01CA1553, 2002-Ohio-2161, citing City of Lakewood v. Papadelis (1987), 32 Ohio St.3d 1,511 N.E.2d 1138, syllabus. Here there was no evidence of a willful discovery violation by the State. Moreover, there was no reasonable probability that the jury would have found differently if Thacker had been given all of the photos before trial. For these reasons, we conclude that the trial court did not abuse its discretion in denying Thacker's motion for a mistrial.
 {¶ 31} Thacker's first assignment of error is overruled.
 III {¶ 32} Thacker's second assignment of error is as follows:
 {¶ 33} "Because the prosecution's version of the facts was strongly rebutted by the defense's, and because the nature of the prosecution case just does not ring true, the conviction should be reversed as against the manifest weight of the evidence."
 {¶ 34} Here Thacker argues that his conviction is against the manifest weight of the evidence because the State's case just does not "feel right." However, a review of all of the State's evidence shows that Thacker's conviction is not against the manifest weight of the evidence.
 {¶ 35} When reviewing a judgment under a manifest-weight-of-the-evidence standard of review "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 36} Thacker was convicted of Murder in violation of R.C. §2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The State argued at trial that Thacker shot Sergent while committing Felonious Assault. Specifically, the two argued, and Thacker threatened Sergent with the gun, eventually shooting her.
 {¶ 37} Thacker first argues that Sergent's news that she intended to divorce him was not enough reason for him to kill her. However, the State is not obligated to offer any evidence of motive. "[T]he question of motive is generally relevant in all criminal trials, even though the prosecution need not prove motive in order to secure a conviction." Statev. Smith (1992), 84 Ohio App.3d 647, 665, 617 N.E.2d 1160, citingFabian v. State (1918), 97 Ohio St. 184, 119 N.E. 410.
 {¶ 38} In any event, Thacker admitted to some of the officers that he and Sergent argued immediately before the shooting. Moreover, Apple heard Sergent, and especially Thacker, yelling loudly enough to be heard through the wall and over the noise of two loud televisions right before she heard the shot fired. Clearly, an argument preceded Sergent's death, although the exact reason for the argument can only be the subject of speculation.
 {¶ 39} Thacker also claims that the testimony of Massey and Downs is not credible, not only because of their status as prisoners, but also because Thacker insists that he would not have maintained his innocence to various police officers but admit to two fellow inmates that he killed Sergent. Nevertheless, the jury also knew that Massey and Downs talked of details of the crime within an hour of Thacker's arrest, before any information could have been seen in the media. They also were aware that neither Massey nor Downs stood to gain anything from their testimony. The jury was capable of determining what weight, if any, this testimony deserved. We do not conclude that the jury lost its way because it may have believed Massey and Downs.
 {¶ 40} Similarly, we cannot conclude that the jury lost its way in rejecting Thacker's varying accounts of Sergent's death. Thacker told different versions of his story to each of the officers that he spoke to. He even gave Major Harden conflicting accounts during each interview. It is not surprising that the jury discounted Thacker's credibility and chose not to believe that Sergent killed herself.
 {¶ 41} Furthermore, there is significant evidence rebutting Thacker's claim that Sergent committed suicide. For example, Officer Fletcher found the gun with a properly cycled new round ready, which only would have been possible if someone had a firm grip on the weapon after it was fired. The new round would not have loaded automatically. Because the autopsy showed that Sergent died immediately from the gunshot, she could not have chambered a new round.
 {¶ 42} Additionally, the State offered impressive evidence from Dr. Casto and Dr. Baden that persons committing suicide who shoot themselves in the head generally hold the gun firmly to their heads, not away from it. Nevertheless, soot deposits and stippling on Sergent's face showed that the gun was a few inches from her face when it was fired. Moreover, Dr. Baden had never seen a woman shoot herself in the eye with a downward trajectory, like the trajectory of the bullet that killed Sergent.
 {¶ 43} Despite Thacker's attempts to paint Sergent as a depressed woman, the State offered substantial evidence of Sergent's happy, optimistic state of mind on the day of her death. Along with her decision to divorce Thacker, Sergent was actively making further plans for her future. Sergent had just undergone cosmetic surgery and dental work to improve her appearance. She was planning improvements to her home, and she was anticipating visits from family and friends.
 {¶ 44} Furthermore, Morgan, Irwin, and Apple agreed that Sergent was extremely uncomfortable around guns. She never shot or even touched them. Thus, shooting was an unlikely means of death had Sergent decided to kill herself.
 {¶ 45} Thacker also attacks the State's gunshot-residue evidence. Experts testified that residue should have been found on the back of the shooter's hand, but none was found on the back of either Thacker's or Sergent's hands. However, while Thacker had the opportunity to wipe off his hands, Sergent did not. Thacker got dressed, made himself a drink, sweated in the police cruiser, and was seen wiping his hands before they were tested for residue. Moreover, a much larger amount of residue was found on Sergent's palm than would be expected from firing the gun once. That was consistent with the State's theory that she held her hand up in a defensive gesture before Thacker fired the gun. The jury was capable of determining what weight to give to the gunshot-residue evidence.
 {¶ 46} Finally, the jury was able to consider Thacker's behavior following the shooting. Notably, Thacker made no attempt either to help Sergent or to call for help. Instead, he waited in the bedroom for Apple to come in before immediately screaming, "I didn't do it, I didn't do it, She did it, She did it!" He then dressed and made himself a drink. When Morgan arrived home a short while later, she is the one who finally called 911. During the call Thacker could be heard yelling belligerently in the background, screaming at Apple. He also insisted that Morgan had to get him out of there. When police arrived, they immediately noticed that Thacker was very drunk and that he was extremely angry and belligerent. The witnesses agreed that Thacker's behavior was callous and devoid of any concern for his wife.
 {¶ 47} In light of all of the evidence presented against Thacker, we cannot say that it is patently apparent that the jury clearly lost its way, and we will not disturb the verdict. This is not one of those exceptional cases in which a new trial is warranted. Thacker's second assignment of error is overruled.
 IV {¶ 48} Both of Thacker's assignments of error having been overruled, the judgment of the trial court is Affirmed.
 a. . . . . .
Brogan, P.J., and Young, J., concur.
[1] At the oral argument of this appeal, the State indicated that the failure to have tested the gun for fingerprints was a regrettable oversight on the part of the investigating officers.